Rocky Mountain Peace & Justice Center v. United States Fish and Wildlife Service, number 21-1310. May it please the court, my name is Randall Weiner. I'm counsel for appellants. In my 35 years of practicing environmental law, I've never seen an environmental analysis under NEPA so I'm going to address the decisions of the U.S. Fish and Wildlife Service to put a trail through the section 16 parcel. I'm going to request supplementation of the record. I'm going to address segmentation and I'm going to address placing trails through the windblown section of the refuge, the most highly contaminated portion, without any written analysis whatsoever. At the end, I'm going to request, actually I'm requesting now, that this court vacate the decision of the Fish and Wildlife Service, that it remand to, that it tell the agency, instruct the agency that if it wants to keep the additional trails open, that it prepare a complete environmental assessment. I'm going to request that you take judicial notice of the, in the interest of justice, of the two attachments to the opening brief which explain that my client submitted to the Fish and Wildlife Service comments regarding the migration of plutonium, the Kaltofen study and the Cook v. under the rug. Let me start, Judge Matheson, if I could, by pointing to the fact that in your decision in Watershed's project, the 2013 decision, you said that, noticed that under the normal course of events, a NEPA analysis starts with an environmental assessment and then if there's a FONSI, a finding of no significant impact, then a full environmental impact statement is prepared. That wasn't done here. In this case, the Fish and Wildlife Service availed itself of a, what should be a seldom used technique to avoid NEPA analysis called a categorical exclusion based on the notion that putting trails where it did in 2018 were minor changes from what was done previously as analyzed in a previous EIS, but they weren't minor. They weren't minor because one of the trails went through the section 16 parcel, which was acquired in 2010, long after sampling was completed, long after the, so the cleanup of Rocky Flats occurred, that one mile of trail went through this section of the refuge and was never, these lands were never analyzed for plutonium contamination. And even more significant the land that was acquired from the state? Yes, it was acquired from the state. And wasn't it examined carefully for plutonium issues at that time? Not in the slightest. It was examined using a phase one analysis. In real estate, you take a look at issues, there was never any examination of radionuclides and that was significant because during the preliminary injunction hearing in this case, there was testimony from witnesses that suggested that there was a white barrel halfway submerged in a lake in the middle of the section 16 parcel. They said you have to take the barrel out of there, but that didn't prove anything. We don't know if the barrel was taken out other than it isn't there now. There was no sampling of the barrel. There was no radionuclide sampling of the lake. And there was no sampling of the 644 acres comprising this section 16 parcel. Well, that wasn't even part of the original nuclear plant, was it? That's correct. It wasn't. So the Fish and Wildlife Service acquired, it basically squared off the corner of this square refuge. It acquired that land in 2010, Judge Kelly, and then, and that was five years after the EPA had conducted any sampling. So the agency made its decision without knowing if it was placing a bicycle and hiking trail onto land that may have been contaminated, which really is kind of a no-brainer to do sampling because it's next to one of the most highly contaminated areas in the country, this Rocky Flats. You'll correct me. I was under the impression that the Colorado Department of Public Health and the environment and the EPA groups determined that the risk to the construction worker in that area was at or below the low end of the applicable risk range. Is that incorrect? It is. It's incorrect because apparently the government did something that was a little hazy here. After we filed the suit and after it made its decision, it did some sampling in 2019 without telling us so we could take split samples. In 2019, a year or more after the agency made its decision, it did some additional sampling on this section 16 parcel. But that's dirty pool. The government can't come in after the fact, do some sampling and use that to justify its decision. Are you reading from the footnote in the response brief? Well, I was under the impression that in 2011, the service issued an environmental assessment specifically addressing section 16. It did. It did, but it didn't. Did anything happen in between there that would have affected it between 2011 and now or 2019? The 2011 environmental assessment, Your Honors, did not deal with placing a trail onto plutonium-contaminated land. It was just an acquisition environmental assessment. Here, the actions we are challenging are the placement of trails and opening to public trails. Well, that's the Greenway. That's the Greenway. It's just that one segment. No, it's also a one-mile of trail through this section 16 parcel. So, you know, the action... Let me just to make sure we have full context. Of course. Didn't the environmental assessment in 2011 include a contamination survey that was closer to the industrial area than section 16? Isn't that what the service was relying upon? I don't believe that those are what the facts are. The service acquired the land in 2010, five years after the Rocky Flats cleanup had occurred, five years after the last of the samples were taken. They did an environmental assessment, but they never addressed the radionuclide issue. Well, again, maybe I'm not understanding their argument. We can hear from them later, but I thought they were arguing that they had done a contamination assessment on land closer to the industrial area than the section 16 parcel, and that that's how they're justifying what they did in the 2011 environmental assessment. Now, I don't know what... You may not agree with that, but isn't that their position? I believe so. They may have taken a few samples that were a little closer to Rocky Flats than the section 16 parcel. If I could just ask in terms of... You raise a whole lot of issues here. I do. In terms of the order in which they should be considered, I've got a question about the categorical exclusion piece of all this. You're arguing that there were extraordinary circumstances that should have prevented reliance on categorical exclusions in the 2018 EAS. Now, if we disagree with you on that, I don't know at this point where any of us may be on that question, but if we did disagree with you on that point and the categorical exclusions stand, then what's left after that? I guess what I'm getting at, it seems like there's some overlap in these arguments, and it seemed to me that maybe that one was a place to start, because depending on how that one turns out, it could affect your other issue. This case was brought under the Administrative Procedure Act, and under the State Farm Standard, if the agency overlooks a significant issue, then it's acted arbitrary and capriciously. And that happened here, and that's why we're asking you to supplement the record. The agency received information regarding the dangerousness of plutonium after 2004. They received the Kaltofen study, which showed much higher levels of radiation. They received the Cook v. Rockwell jury verdict form, where a $900 million award was awarded. Well, that had nothing to do with this area, though, did it? Yeah, we believe it certainly does. Migration of plutonium from the central core, if you think of Rocky Flats as a donut, and the central core is still the Superfund site, and then the outer core is where the refuge is, any migration of plutonium that goes to lands beyond the donut is also impacting areas of the donut itself. So, yes, we believe it's important. What I was saying about arbitrary... Did you provide any information to the district court showing that the service had the Kaltofen study and the Cook jury verdict form? No, we didn't. We did not get those materials until our clients looked through their records and saw they had actually submitted them to the service. But what's interesting... And neither of those is a public record, is it? They're not a traditional public record. One was... I don't know what you mean by public record. Can you find them in the... Public records, as we typically require in order to exercise judicial notice. They have to be not subject to debate, among other things. So, in the board case, the seminal case dealing with supplementation of the record is the... Is the American Mining Case, Judge. And in the American Mining Case, for the very first time in the Court of Appeals, the court took judicial notice of supplemental materials. One was a letter that was not in the public record. And the court does this based on... Takes judicial notice in the interest of justice. And here, where the agency actually received these documents and buried them under the rug, this court should follow the American mining standards and accept them. There are two types of American mining documents. Pools of documents. One is where documents are needed to complete the record. And one is where they're needed to supplement the record. These two documents are needed to complete the record. As are the internal e-mails from the agency, which showed that the prior regime, the previous director, had a policy of keeping trails off the windblown area, the most contaminated portion. And those e-mails should have been in the record so that we could... By excluding that from the record, the agency didn't have a complete record. And we ask you to overturn the district court and have these supplemented in the record. In addition, during the preliminary injunction hearing, there was testimony from witnesses. You talked, for instance, about that white drum, that painted drum. One witness said that white paint meant that it was a plutonium drum on its way to whip. And those testimony, witnesses were subject to cross-examination. There's an addition of reliability. We ask you to supplement the record with those documents. And we're doing that because overall, really, in my two minutes left, what this case is about is transparency. And Judge Kelly, you yourself... Counsel, time is flying, so let's try to get another question in. I'm back on the categorical exclusions. I don't think I really heard an answer to my question, but let me zero in a little bit on it. Yes, sir. As far as the highly controversial extraordinary circumstance argument based on controversy in opening the refuge to public hiking, wasn't that addressed in the 2004 EIS? Seems like you're trying to re-litigate something that happened more than 15 years ago. Well, it wasn't. It was a current dispute between Broomfield, Superior, and Westminster as to where the access point would be on the eastern side of the refuge. Well, did you present that argument in district court? Yes, both in district court and your court. And we argue that... Wait, our court? I'm sorry? You mean in your appeal now? Yes. Yeah, did you present it to the district court? We did, Your Honor. And we argued that it was highly controversial with respect to the fact that these three cities were vying for a different access point, and that goes to the... And this was... Well, just because cities are vying for an access point, why does that become highly controversial? Because... Because there's debate over something doesn't automatically make it highly controversial for purposes of the categorical exclusion. Highly controversial has been interpreted by courts not to mean the public is up in arms against you, up against it. You're right. What it has been interpreted to mean is that it impacts the size, nature, and effect of an activity, and where the location is goes into the size, nature, and effect. Even worse, Your Honor, is that there's no paper trail. The agency made its decision as a categorical exclusion, and we have no way of knowing why they chose among competing access points, whether they did it for safety purposes. The lack of a paper trail makes this case arbitrary and capricious. Thank you, counsel. Good morning, Your Honors, and may it please the Court. Michelle Milton on behalf of federal defendants. I have some prepared remarks this morning, but first I would like to respond to Mr. Weiner's comments, both about the categorical exclusion... and the Section 16 parcel. Can you slow down just a hair? I apologize, Your Honor. Yes. Okay, because I can hardly understand you. Can you speak a little louder? Thank you. First, to your point, Judge Matheson, I agree with you entirely if you were suggesting that this is not the kind of controversy here that constitutes controversy within the meaning of NEPA, but I'd actually like to take a step even further back and say that any controversy over the eastern access point in the Refuge is not at issue in this action. As the 2018 Environmental Action Statement clearly shows, the service exempted or accepted both the eastern portion of the Greenway and the eastern access point from this action. That was to be the decision about where to put that entrance point was not yet made at that time, and the service is consistent. This goes to the segmentation argument, doesn't it? It... as I understand it, he was arguing in the context of controversy, but I'd be happy to also address segmentation. But we're also talking about taking... the trail modification in the windblown area is outside of... isn't your position that that was not decided? There's no planned action in the 2018 EAS? The service had not decided at that time to move forward with that portion of the trail. The eastern access point. I understand the argument that that was an improper... at least the argument is that that was an improper segmentation. One of their arguments is that that was improper segmentation. Why wasn't it? After all, this is supposed to be an integrated, interconnected trail system, and the 2018 EAS actually mentions, it probably mentions the windblown area trail more than the other trails, at least in writing. And yet, it's not... all of a sudden it's being pushed aside and said, well, we'll apply NEPA to that down the road. But why is it reasonable to carve that out? Well, I have two responses, Your Honor. The first is that it wasn't... the agency, when it initially made its plan for opening the refuge to the public in its 2004 CCP and EIS, examined all of these trails. I want to be very clear that there are no safety issues, whether it's in the windblown area or not. The service examined all of that in the 2004 CCP EIS and decided that it was okay to put those trails there. I would say that that alone defeats the segmentation argument. However, if Your Honors are not persuaded by that, I would say the test in this circuit for whether there was... for whether two actions are connected is the independent utility test. And the question is whether the trails that the service decided to move forward with have independent utility from the eastern access point and the eastern part of the Greenway. And the answer to that, Your Honor, is I think unequivocally, yes. These trails are in use today. 40,000 visitors visited the refuge in the year 2020 enjoying these trails. I think that that itself speaks to the independent utility these trails have, whether or not there's ultimately a connection built, which I should add to correct the record. They have not yet been built and there's been no final decision about them. Turning, if I may, to the Section 16 parcel, Your Honors. I just want to clarify a few points about that parcel, both about how it was acquired, what the prior environmental analysis was, and just how that has come to be. The Rocky Flats Act, Section 3174, provides for 300 feet in the east of the refuge to ultimately be sold or given away as for transportation improvements along Indiana Street. The service talked to its local partners. They ultimately proposed a land swap, land on the eastern portion of the refuge in exchange for the Section 16 parcel. At the time, Your Honors, nobody, and I truly mean nobody, thought that there was any concern about plutonium on the Section 16 parcel. It had never been part of the Rocky Flats site. Geography demonstrates why it would not be. It is upwind of the site, so when the wind blows from that central hole of the donut, to use Mr. Weiner's analogy, it blows to the east. But there was no contamination assessment of the Section 16 parcel, correct? That's not correct, Your Honor. There was a contamination assessment of the Section 16 parcel. What there was not was actual soil samples taken on the Section 16 parcel itself. And the reason for that... Could you just explain the difference between contamination assessment and soil samples? Sure. Any time that the parcel comes into, or any time land comes into the service's jurisdiction prior to accepting jurisdiction, the service conducts a broad-ranging analysis of what possible contaminants are in the area. That's not just radionuclides. It's also any kind of hazardous chemicals, or hazardous waste, or just debris that is in the area. And so this assessment was looking at all of those potential environmental contaminants, not limited to plutonium. Although, of course, plaintiffs are concerned about plutonium here. That was not the only thing that the service looked for when it assessed the section. And that was a Phase 1? Is that the Phase 1 you're talking about? Yes, Your Honor. That's correct. Okay. And so that would be primarily a historical record of how the property was used, but no soil samples actually taken. There was water sampling, Your Honor, but there was no soil sampling specifically for plutonium. And the reason for that was that the expert who did the assessment talked to a service land person who was very knowledgeable about the potential for plutonium contamination on the site, and also looked at the history of sampling, which occurred along the border with the refuge. And those samples were at or below background levels. And so I would direct Your Honors to the administrative record at page 1362. I think that makes it very, very clear graphically why there really just was no concern here, and why nobody at the time, a prior lawsuit over this land swap, ever raised this issue. People were very, very concerned about plutonium contamination on the eastern end of the refuge, which is where the wind blows. And as previous sampling had demonstrated, was an area of potential concern. But nobody had ever thought that there was any reason to believe that the Section 16 parcel was contaminated. And I would just add that even going back, EPA, when it initially defined the site, the Rocky Flats Superfund site, it did include both the central operable unit, which is the industrial area, plus some acreage, as well as the peripheral operable unit, which is what now constitutes the refuge. If there was another operable unit, which was Operable Unit 3, which was lands off of the DOE site, and those lands included Stanley Lake. All of the lands ranging from the northeast to the southeast, those were the lands that the Colorado Department of Public Health and the EPA were concerned about. Nobody was truly concerned about contamination on the Section 16 parcel, which, after all, had never been part of the site, had been continuously used for mining, for recreation, for grazing. There was grazing on that land in the past. There continues to be grazing on that land. It was used for agricultural purposes. This just was not a concern.  I think, demonstrates precisely why and was supportive of the service's decision to issue a FONSI in 2011, which I would add is not on review here. It was not arbitrary and capricious, in our view, for the service to rely on that 2011 FONSI, which is exactly what the District Court held. Could I just ask on Section 16, the proposal was to add a mile-long trail? The 2018 proposal? Right. Yes. All right. That's not a modification so much as it's a new trail. So why isn't that a significant new circumstance or an extraordinary circumstance? Well, Your Honor, I would say two things to that. First, the 2011 EA did examine the possibility of bringing that parcel into the refuge consistent with the purposes and uses outlined in the 2004 CCP. So I think it was clear at the time, 2011, that everyone believed that the Section 16 parcel would be managed the same way the rest of the refuge was managed, which is for public use as well as other purposes. To your question of why adding a mile of parcel, or excuse me, a mile of trail on this parcel is not an extraordinary circumstance, the extraordinary circumstances are a regulatory, are outlined in the Department of Interior regulations. I don't, there's no, there's no regulatory provision that I think that this would fall into to make this an extraordinary circumstance. Appellants have argued in reply, for the first time in reply, that this is a, it presents unique or unknown effects. We think that it's improper for them to raise this in reply since, although it was an issue that they raised below, they had abandoned it on appeal. But I would also just say for the reasons that we've discussed already, there's just no merit to the argument that there were unknown or unique risks here. And that is the only categorical, excuse me, that is the only extraordinary circumstance that would preclude the application of a categorical exclusion here. Now, you've argued that Mr. Stafford didn't, Mr. Stafford's declaration of testimony weren't enough for standing on the Endangered Species Act claim, but do you have any question about the claim of standing to make their NEPA claim? Your Honor, we have not challenged their standing here. As I understand their argument, although this is a question that you, of course, can direct to them as well, if I understand their argument, they are concerned that the very minor activities contemplated by this EAS will entrain, will kick up essentially dust, and that dust will entrain itself into the air and blow onto them. We don't agree as a factual matter with that, Your Honor, but we've chosen not to challenge, we've chosen not to challenge their standing. I think it's a tough injury argument, and they also have not necessarily articulated precisely their theories of traceability and redressability, but it's not an argument that we have made. Although, of course, we think that you're entitled to find that they do not have standing on any of these claims, Your Honor. So you're not challenging standing? As to the NEPA claims, we do. I'm sorry, what? As to their NEPA claims, we're not challenging standing. We do have concerns about their Endangered Species Act claims, standing for those claims, which I'd be happy to address as well. And I do want to correct perhaps some misimpressions or something that the other side said in their briefing. They cite the case of State of Utah v. Babbitt for the point that at a PI hearing, the standard is akin to the motion-to-dismiss stage. This Court expressly reserved that question in that case, and we would argue and we believe that the standard is actually more appropriately the summary judgment standard, not the motion-to-dismiss standard. We think it ultimately doesn't matter because we don't think that they even meet the reduced burden under the motion-to-dismiss stage, but we nonetheless wanted to flag that for the Court. I would also just point out, as to procedural injury here, Your Honor, they make a lot about procedural injury. I just have two points in response. First, we don't actually think that there's a procedural injury here because in a Section 7 consultation, Your Honors, there's no procedural right to participate. They have no, it's an intergovernmental or an intragovernmental process, and we think there is no procedural right here. But in any event, we think that they are wrong when they say that a procedural injury alone is sufficient to confer some sort of, a procedural violation is enough to confer standing. That is not how we read Spokio. We think the Court was very clear in Spokio that there needs to be some independent injury, and we think here there plainly is none. Even accepting, if you do, that they have an interest, Mr. Stafford has an interest in raptors, we just don't see how any of the actions that the service has contemplated here could affect those raptors. And so we don't think that they have pleaded or demonstrated any concrete or any threat to any interest that they have articulated here. It sounds a little bit like you're making the causation or redressability argument. You can characterize it any way you want, Your Honor. I think it does overlap considerably with the causation argument, but we also fail to see an injury, a threat. I think they've articulated an interest in the raptors, but we don't think that there's a articulated or plausible as opposed to hypothetical threat to the raptors that Mr. Stafford enjoys. I would also like to draw this Court's attention to a case that was decided in September 2021, which also addresses some of the segmentation issues that you raised, Judge Mathison, that is Town of Superior Bee, Fish, and Wildlife Service. It is an unpublished decision from the District Court of Colorado. It is 2021 Westlaw 420-6425. Although we don't think it's, obviously, binding on this Court, it does address many of the same issues although not all of the same issues that were raised here. And so we think that that is persuasive authority that not just Judge Broomer here, but also another judge against other, you know, adjudicating claims against the service on the same action. Is that cited in your brief? It is not, Your Honor, and I apologize for that. It might help just to send us a 28-J letter. I would be happy to. I apologize for that, Your Honor. I see your time has expired. My time has expired. Thank you very much for indulging me this morning. I appreciate it. Thank you, counsel. Thank you, counsel. I appreciate your arguments this morning. The case will be submitted and counsel are excused.